IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION AT MEMPHIS

| | | |
|---|---|---|
| JANIS WHITTEN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05-2761-JPM/tmp |
| | ) | |
| MICHELIN AMERICAS RESEARCH | ) | |
| & DEVELOPMENT CORPORATION, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

ORDER DENYING MICHELIN'S MOTION TO EXCLUDE OPINIONS OF TROY
COTTLES AND FOR SUMMARY JUDGMENT
AND
ORDER GRANTING IN PART AND DENYING IN PART ISUZU'S MOTION
TO EXCLUDE AND FOR SUMMARY JUDGMENT

Before the Court are Defendants Michelin North

America, Inc. and Michelin Americas Research & Development

Corp.'s (collectively "Michelin") Motion to Exclude

Opinions of Troy Cottles and for Summary Judgment (Doc.

192) and Defendant Isuzu Motors America, Inc., Isuzu

Motors, Ltd., and Subaru of Indiana Automotive, Inc.'s

(collectively "Isuzu") Motion to Exclude Testimony of

Plaintiffs' Experts and for Summary Judgment (Doc. 191),

filed March 10, 2008.  Plaintiffs filed their responses in

opposition (Docs. 202-208) on April 14, 2008.  Defendants

Michelin replied in support of its motion on April 24, 2008

(Doc. 211).  The Court held a hearing in these matters on

April 28, 2008.  For the reasons discussed below, the Court
DENIES Defendant Michelin's Motion to Exclude Opinions of
Troy Cottles and for Summary Judgment and GRANTS IN PART
AND DENIES IN PART Defendant Isuzu's Motion to Exclude
Testimony of Plaintiffs' Experts and for Summary Judgment.

**I. Background**

    This products liability case arises out of a motor
vehicle crash that occurred on September 6, 2004, on
Interstate 55 near Batesville, Mississippi.  Kristen
Vanderford Matthews was driving a 1995.5 Isuzu Rodeo ("the
Rodeo") with Kevin Green in the front passenger seat when
the Rodeo's right rear tire detreaded.  (Compl. (Doc. 1-12)
at 8.)  According to eyewitness testimony, the Rodeo
swerved to the right and then to the left, driving into the
median.  (Craft Dep. (Doc. 191-15) at 31-35.)  Once in the
median, the Rodeo rolled over between four and six times
traveling a distance of approximately 255 to 258 feet.
(Tandy Dep. (Doc. 191-16) at 18-19.)  Ms. Matthews and Mr.
Green were both wearing their seatbelts.  (Burton Expert
Report (Doc. 203-15) §§ III, VII.)

    During the roll sequence, the Rodeo's roof was crushed
approximately twelve inches on the driver's side.  (Forrest
Expert Report (Doc. 206-2) at 6.)  Both the lap and
shoulder belt portions of Ms. Matthews's seatbelt loosened

approximately ten inches, and Ms. Matthews was partially ejected through the open window of the Rodeo. (Burton Expert Report § III.) Ms. Matthews suffered fatal head and brain injuries as a result of the rollover, and her death certificate states that the cause of death was massive trauma to the head. (Burton Expert Report § III; Rhea Dep. (Doc. 191-17) at 18.) Mr. Green suffered injuries including a broken pelvis, a number of broken ribs, a punctured lung, a ruptured liver, and a broken thumb. (Green Dep. (Doc. 191-18) at 59-60.) Plaintiffs filed suit against Isuzu and Michelin alleging that the designs of the Rodeo and the tire were defective (Compl.)[1]

## II. Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of

---

[1] At the hearing, the parties agreed that Mr. Green's injuries were not the result of any alleged defect in the Rodeo, and therefore, his claims must be dismissed as to Isuzu. Accordingly, the Court GRANTS Isuzu's Motion for Summary Judgment as to Mr. Green.

material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate.  Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989).  In considering a motion for summary judgment, however, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion."  Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also  Abeita v. TransAm. Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.

## III. Analysis

To prove a products liability case, a plaintiff must establish "(1) that the plaintiff was injured by the product, (2) that the injury resulted from a defect in the product which rendered it unreasonably dangerous, and (3) that the defect existed at the time it left the hands of the manufacturer." Early-Gary, Inc. v. Walters, 294 So.2d 181, 186 (Miss. 1974).[2] In addition, in a defective design case, a plaintiff must establish that the product "failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm." Hammond v. Coleman Co., 61 F. Supp. 2d 533, 536 (S.D. Miss. 1999). If the plaintiff's design alternative impairs "the utility, usefulness, practicality, or desirability of the product to users or consumers," or if the plaintiff fails to test the utility, practicality or desirability, it is not a feasible design alternative under Mississippi law and the plaintiff's design defect claim fails as a matter of law. Id. A plaintiff must provide expert testimony to support defect allegations, and if that expert testimony is unreliable, or is otherwise

---

[2] The Court has already determined that Mississippi law governs these claims. (Order (Doc. 120) at 1-2.)

inadmissible, the plaintiff's products liability claim

fails as a matter of law.  Id. at 542.

     With respect to the admission of expert testimony, the

Federal Rules of Evidence provide that

> [i]f scientific, technical, or other specialized
> knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or
> education, may testify thereto in the form of an
> opinion or otherwise, if (1) the testimony is
> based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles
> and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of
> the case.

Fed. R. Evid. 702.  The trial judge serves as a gatekeeper

who "must ensure that any and all scientific testimony or

evidence admitted is not only relevant, but reliable."

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589

(1993); see also Fed. R. Evid. 402.

     In Daubert, the Supreme Court elaborated upon the

reliability requirement by identifying several factors that

bear on a trial judge's determination of the reliability of

an expert's testimony.  Those factors include (1) whether a

theory or technique can be or has been tested; (2) whether

it has been subjected to peer review and publication; (3)

whether a technique has a high known or potential rate of

error and whether there are standards controlling its

operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. Daubert, 509 U.S. at 592-94. The gatekeeping function of the trial judge described in Daubert is not limited to scientific evidence and testimony, but also applies to "technical" and "other specialized" knowledge. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 147 (1999)(explaining that the obligations imposed on a trial judge by Daubert apply to all expert testimony). "[T]he test of reliability is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case." Kumho, 526 U.S. at 141.

**A. Michelin's Motion to Exclude Testimony of Troy Cottles and for Summary Judgment**

Michelin has moved to exclude the testimony of Troy Cottles and for summary judgment. Plaintiffs offer Mr. Cottles as an expert witness regarding the defectiveness of the Michelin tire involved in this case. Michelin has not challenged Mr. Cottles's qualifications to testify as an expert witness.[3] However, Michelin has challenged the

---

[3] Mr. Cottles was employed in the tire industry for seventeen years with Dunlop Tire Corporation and Goodyear-Dunlop Tires N.A. Ltd. (collectively "Goodyear-Dunlop"). During that time, Mr. Cottles designed, manufactured, and tested steel belted radial tires. (Cottles Aff. (Doc. 202-2) at 1-2.) He has testified at numerous trials in both state and federal courts on tire failure analysis and tire design and

reliability of Mr. Cottles's opinions, specifically his opinion that the presence of "cord shadowing" indicates that the innerliner of a tire is too thin, a condition that increases the probability of air and water permeation, which, in turn, decreases tire durability. Michelin asserts that Mr. Cottles's opinions regarding cord shadowing fail to meet <u>Daubert</u>'s requirements for admission because they are the result of his own subjective opinion and experience, they are not based upon any testing by himself or anyone else, and they have not been peer reviewed. (Def. Michelin's Mem. in Supp. of Its Mot. to Exclude Ops. of Troy Cottles and for Summ. J. (Doc. 192-2) at 6-7.) Also, Michelin asserts that Mr. Cottles's other opinions fail <u>Daubert</u> for the same reasons.

An expert may "draw a conclusion from a set of observations based on extensive and specialized experience." <u>Kumho</u>, 526 U.S. at 156. In this case, Mr. Cottles posits fourteen conditions that contribute to the defectiveness of the design of the Michelin tire involved in the wreck, one of which is a thin innerliner, indicated by the presence of cord shadowing. (Cottles Expert Report (Doc. 202-3) at 26-30.) The other thirteen flaws include

_____

manufacturing. His opinions have never been excluded by any court of law. (Cottles Aff. 6.)

the absence of nylon reinforcement, oxidative degradation, the lack of an adequate belt wedge gauge, improper bonding, poor bonding between the tread edge and the sidewall junction, poor bonding between the #1 belt and the underlying ply skim and belt cushion, undulations on the belt edges because of the deep "pocket" design of the tread shoulder grooves, stress risers, irregularly spaced belt cables, offsets at splice points, the uncentered placement of the steel belts, the presence of spread #1 and #2 belt cables over the wide circumferential grooves, and the fact that the tire was not as robust as when it was first manufactured. (Id.)

Mr. Cottles maintains that it is common practice in the tire industry to conclude that cord shadowing indicates a thin innerliner. (Cottles Aff. 20.) Mr. Cottles also maintains that, during his employment with Goodyear-Dunlop, he was trained to segregate tires with evidence of cord shadowing because of concerns over their durability. (Id.) At least one expert in a similar case has offered a similar conclusion regarding cord shadowing. Williams v. Michelin N. Am., Inc., 381 F. Supp. 2d 1351, 1358 (M.D. Fla. 2005). Mr. Cottles admits that the only published literature on cord shadowing does not support his conclusion that cord shadowing indicates an innerliner that is too thin (Cottles

Dep. (Doc. 192-3) at 177-80), and that he has formed this
opinion without the support of any testing on the effects
of cord shadowing on tire performance.  (Id. at 173-177.)

However, Mr. Cottles's opinion that cord shadowing
indicates a design defect remains only one part of a larger
theory involving fourteen separate flaws that contribute as
a whole to the defectiveness of the tire's design.  Mr.
Cottles has provided examples of testing and peer-reviewed
literature that support his overall theory that these flaws
collectively contributed to the defectiveness of the tire.
(Reference Materials (Doc. 202-5) at 1-4.)

In challenging Mr. Cottles's testimony regarding cord
shadowing, Michelin ignores the context in which that
opinion is made.  In this case, Mr. Cottles has drawn a
conclusion about tire durability based upon his previous
employment with Goodyear-Dunlop, general practice within
the tire industry, and a combination of fourteen observed
design flaws.  See Kumho, 526 U.S. at 156.  Therefore, it
appears that, while Mr. Cottles's conclusions regarding
cord shadowing may be contested at trial by "[v]igorous
cross-examination, presentation of contrary evidence, and
careful instruction on the burden of proof, [which] are the
traditional and appropriate means of attacking [allegedly]
shaky but admissible evidence," Daubert, 509 U.S. at 596,

these conclusions have met the requirements of relevance and reliability under Daubert. The Court denies Michelin's Motion to Exclude Opinions of Troy Cottles, and as there remains a genuine issue of material fact, the Court denies Defendant Michelin's Motion for Summary Judgment.

**B. Defendant Isuzu's Motion to Exclude Testimony of Plaintiffs' Experts and for Summary Judgment**

Isuzu has moved to exclude the testimony of Plaintiffs' experts, Stephen Meyer and Stephen Forrest, and for summary judgment. Plaintiffs' claim against Isuzu is a crashworthiness product liability claim, adopted by the Mississippi Supreme Court in Toliver v. General Motors Corp., 482 So.2d 213 (Miss. 1986). Crashworthiness focuses on what has been called the "second impact" theory, under which the manufacturer of a product may be held liable for alleged defects in its product design that did not proximately cause or proximately contribute to the initial collision. Id. at 216. Instead, the focus is on the "second impact" or the enhanced injuries caused to the plaintiff as a result of product defects. Under this strict liability doctrine, a plaintiff must prove that he was injured as a result of defects in the product which rendered the product unreasonably dangerous. Id.

**1. Isuzu's Motion to Exclude Testimony of**

**Stephen Meyer**

Defendant Isuzu has moved to exclude the testimony of Plaintiffs' expert Stephen Meyer. Plaintiffs offer Mr. Meyer as an expert witness regarding the defectiveness of the occupant restraint system in the Rodeo. Isuzu has not challenged Mr. Meyer's qualifications to testify as an expert witness.[4] However, Isuzu asserts that Mr. Meyer has not offered any alternative designs for the occupant restraint system and that, if he has, he has not conducted testing to demonstrate that any alternative designs would have been effective in this case. (Mem. in Supp. of Mot. to Exclude Test. of Pl.'s Experts and for Summ J. ("Isuzu's Mem.") (Doc. 191-2) at 4.) According to Isuzu, Mr. Meyer "never said precisely what design would have been necessary, in his opinion, to render the subject vehicle non-defective." (Id.)

Isuzu cites two cases in support of its claim that, because Mr. Meyer did not offer a single alternative design, his testimony should be excluded. Isuzu relies on

---

[4] Mr. Meyer is an engineer in the firm Safety Analysis and Forensic Engineering ("SAFE"). (Meyer Aff. (Doc. 205-2) at 1.) Mr. Meyer's experience spans almost twenty years in the areas of accident reconstruction, automotive safety research, vehicle crashworthiness analysis, and restraint system design, analysis, and testing. Id. Mr. Meyer has published over fifty peer reviewed articles and has testified as an expert in numerous state and federal courts in the areas of automotive safety, accident reconstruction, vehicle crashworthiness, and restraint system design and testing. Id. at 2.

Guy v. Crown Equipment Corp., 394 F.3d 320 (5th Cir. 2004),
which upheld a district court's exclusion of an expert who
identified a design defect and opined only generally about
potential alternative designs, and on Vaughan v. Kia Motors
Corp., No. 3:05CV38JS, at *26 (S.D. Miss. Jan. 11, 2007)
(Daubert hr'g tr.)("The proper methodology for proposing
alternative designs includes more than just conceptualizing
possibilities.")(quoting Guy, 394 F.3d at 327).   In
addition, Isuzu cites Guy and Hammond v. Coleman Co., 61 F.
Supp. 2d 533 (S.D. Miss. 1999), for the proposition that
Mississippi law requires that the Court exclude the
testimony of an expert that does not attempt "to simulate
or recreate the incident."   Hammond, 61 F. Supp. 2d at 541.

     Unlike the challenged experts in Guy, Vaughan, and
Hammond, Mr. Meyer has recommended specific design
alternatives for the occupant restraint system and has
identified testing that supports his conclusion that these
alternative designs would have been effective in this
crash.   Mr. Meyer's design alternatives include a cinch
latch plate rather than a pass-through latch plate, a
retractor with increased sensitivity, and a stronger
anchoring point for the seat belt, or in the alternative,
an All-Belts-to-Seats (ABTS) design.   (Meyer Expert Report
(Doc. 205-2) at 6-10; Meyer Dep. (Doc. 205-4) at 27.)   In

addition, Mr. Meyer has provided documentation of testing that supports his conclusion that these design alternatives would have proved effective during the crash in question. (Reference Materials (Doc. 205-5) at 1-3.)  The testing conducted by Mr. Forrest also supports Mr. Meyer's conclusions regarding the alternative design of a stronger anchoring point for the seat belt.  (Meyer Dep. 156-57.) Moreover, an expert is not required to test an alternative design himself in order for his testimony to be admissible. Watkins v. Telsmith, Inc., 121 F.3d 984, 992 (5th Cir. 1997)("This is not to say that alternative product designs must always be tested by a plaintiff's expert.").  Mr. Meyer's opinion satisfies Mississippi's product liability requirements for an alternative design and alternative design testing.  Accordingly, the Court DENIES Isuzu's motion to exclude the testimony of Stephen Meyer.

**2.  Isuzu's Motion to Exclude the Testimony of Stephen Forrest**

Isuzu has moved to exclude the testimony of Plaintiffs' expert Stephen Forrest.  Plaintiffs offer Mr. Forrest as an expert on the defectiveness of the Rodeo's roof structure design.  Isuzu has not challenged Mr.

Forrest's qualifications to testify as an expert witness.[5]

However, Isuzu has challenged the reliability of Mr.

Forrest's opinion, asserting that Mr. Forrest's test for

his alternative design does not sufficiently approximate

the conditions under which Plaintiffs' crash occurred and

that Mr. Forrest's modifications are untested and likely

dangerous.  (Isuzu's Mem. 8-14.)

In testing his alternative design, Mr. Forrest

inverted a 1995 production Rodeo like the one involved in

Plaintiffs' crash and dropped it on its roof from a height

of fourteen inches.  (Forrest Expert Report 24-25.)  Mr.

Forrest then performed the same test on another 1995

production Rodeo with an alternative design that included a

reinforced roof structure.  The production Rodeo with the

alternative design outperformed the unaltered production

Rodeo.  (Id.)

Isuzu asserts that this test does not sufficiently

recreate Ms. Matthews's multiple-rollover crash and,

---

[5] Mr. Forrest is an automobile safety researcher and design engineer
with SAFE, with over thirty years of experience in automotive safety
issues including analysis, design, and testing.  (Forrest's Resp. to
Def.'s Mot. for Summ. J. ("Forrest's Resp.") (Doc. 203-2) at 1-2;
Forrest Expert Report (Doc. 203-13) at 1.)  Automobile roof structures
have been the main focus of his work for the last ten to fifteen years.
Id.  Mr. Forrest has published over seventy technical papers, most of
which have been peer reviewed, on the subject of automotive safety,
including many on the subject of occupant protection in rollover
accidents, crashworthiness of roof structures, and inverted drop
testing.  Id.  Mr. Forrest has discussed inverted drop tests as part of
his trial testimony in over twenty different cases.  (Forrest Trial
Test. List (Doc. 203-5) at 1.)

therefore, is not reliable.  (Isuzu's Mem. 8.)  Isuzu cites

Tunnell v. Ford Motor Co., 330 F. Supp. 2d 731 (W.D. Va.

2004), for the proposition that tests like Mr. Forrest's

must be performed under conditions substantially similar to

the subject accident.  However, the "substantial

similarity" test applies to the admissibility at trial of

experiments or tests that purport to reenact the accident.

See, e.g., Burns v. Ford Motor Co., 2008 WL 222711, at *3

(W.D. Ark. Jan. 24, 2008)(citing McKnight v. Johnson

Controls, Inc., 36 F.3d 1396 (8th Cir. 1994)); Muth v. Ford

Motor Co., 461 F.3d 557, 566 (5th Cir. 2006)("When the

demonstrative evidence is offered only as an illustration

of general scientific principles, not as a reenactment of

disputed events, it need not pass the substantial

similarity test."); Crossley v. Gen. Motors Corp., 33 F.3d

818, 822 (7th Cir. 1994)("Demonstrations of experiments

used merely to illustrate the principals forming an expert

opinion do not require strict adherence to the facts, and

the courts may admit such demonstration so long as they are

offered to illustrate scientific principals rather than as

re-enactments.")(citations omitted); Rios v. Navistar Int'l

Transp. Corp., 558 N.E.2d 252 (Ill. App. Ct. 1990).

    In this case, Mr. Forrest has stated that the purpose

of the inverted drop test was not to recreate the accident.

(Forrest's Resp. § 13(a)-(g) ("[I]t is impossible for me or anyone to know what all the specific details of the subject accident [are]. The only way [for] me to know all the forces, speeds, accelerations, etc. that the accident vehicle experienced, would be if the subject Rodeo had been equipped with sophisticated electronic sensors and if I then had access to this data.").) Instead, an inverted drop test is designed to match an amount of energy with an amount of roof crush in a controlled environment, which allows the expert to draw conclusions from the resulting data. (Id. § 13(b).) Inverted drop testing is widely used throughout the automobile industry. (Id. § 12(f)-(k)); see also Moody v. Ford Motor Co., 2006 WL 3354472 (N.D. Okla. Nov. 16, 2006); Brawn v. Fuji Heavy Indus., Ltd., 817 F. Supp. 187 (D. Me. 1993). Accordingly, Mr. Forrest's inability to create a test substantially similar to Plaintiffs' crash does not render his opinion unreliable.

Isuzu also claims that Mr. Forrest's testimony is unreliable because his proposed design alternative is untested and likely dangerous. Isuzu cites Glenn v. Overhead Door Corp., 935 So.2d 1074, 1082 (Miss. Ct. App. 2006), for the proposition that Mississippi law requires that an expert test his alternative design to determine whether it "would impair the utility, usefulness,

practicality, or desirability of the [product]."  Isuzu
also asserts that "[i]t is very likely that adding
extremely heavy steel to a portion of the vehicle that a
passenger is likely to hit could cause injuries, in
rollover crashes or in other types of crashes, which might
not have otherwise occurred."  (Isuzu's Mem. 13.)

However, <u>Glenn</u> does not require that an expert test
his alternative design for those factors.  It merely
affirmed the exclusion of the testimony of an expert who
did "not give an opinion as to whether his alternative
design would impair the utility, usefulness, practicality,
or desirability of the [product]."  <u>Glenn</u>, 935 So.2d at
1082.  In this case, Mr. Forrest has given an opinion about
his alternative design's effect on those factors.
(Forrest's Resp. § 20(b)("[I]t is extremely likely that a
stronger roof would enhance the performance in all Federal
Standards. . . . There is nothing incompatible between my
alternate designs and meeting any other Federal
Standard.").)

In addition, an alternative design that has been
widely used in another product can be presumed to have been
tested.  <u>See, e.g.</u>, <u>MacCleery v. Royce Union Bicycle, Inc.</u>,
1996 WL 442707, at *4 (D.N.H. June 11, 1996)("[A] design
which is in current commercial use is presumptively

18

effective and, as such, cannot be dismissed as an untested

and novel theory simply because the expert did not also

identify a testing procedure which validates the

effectiveness."); <u>Stanczyk v. Black & Decker, Inc.</u>, 836 F.

Supp. 565, 567 (N.D. Ill. 1993)(holding that, in the

absence of peer review or industry practice, an alternative

design was inadmissible).  In this case, Mr. Forrest's

alternative design has been used by many automobile

manufacturers.  (Forrest's Resp. § 19(a)-(b).)  It can,

therefore, be assumed that the design is effective, tested,

and safe.  Accordingly, the expert testimony of Mr. Forrest

is reliable, and the Court DENIES Isuzu's Motion to Exclude

Opinion of Stephen Forrest.

### 3.  Isuzu's Motion for Summary Judgment

Isuzu argues that it is entitled to summary judgment

because Plaintiffs[6] "have not adduced any evidence that (1)

the alleged defects in the Rodeo's roof or restraint system

caused Ms. Matthews's death; or (2) the proposed

alternative designs would have made any difference."

(Isuzu's Mem. 14-15.)  Plaintiffs assert that they have

provided "substantial evidence that the roof structure and

restraint system in the 1995.5 Isuzu Rodeo were defective,

---

[6] As discussed <u>supra</u> note 1, Mr. Green's claims against Isuzu have been
dismissed.  For purposes of this section, the term "Plaintiffs" refers
to all plaintiffs excluding Mr. Green.

that the defects in the Rodeo's roof and restraint system caused Ms. Matthews's death and that the proposed alternative designs would have prevented her death." (Pl.'s Opp'n to Def. Isuzu's Mot. for Summ. J. (Doc. 208) at 11.) In other words, Plaintiffs have offered evidence that the defects in the Rodeo's occupant restraint system and roof structure together caused the death of Ms. Matthews's and that the alternative designs proposed by both Mr. Meyer and Mr. Forrest would combine to alleviate those defects. (Meyer Expert Report 10 ("Looseness in the shoulder belt portion was a result of the foreseeable deformation of the vehicle's B-pillar structure to which the driver's side restraint D-ring was mounted and likely enhanced by the retractor's failure to remain locked through the multiple impact multi-planar rollover collision."); Meyer Dep. 156 ("I would certainly rely upon the drop testing that demonstrates B-pillar deformation."); (Forrest Expert Report 31 ("Roof crush deforms the structure surrounding the window such that the window opening (ejection portal) moves much closer to the occupant's body. . . . Even if the occupant doesn't move at all relative to the vehicle, the downward movement of the side header and window opening increases the occupant's outside exposure.").) Therefore, there remains a genuine

20

issue of material fact regarding these issues, and Isuzu's Motion for Summary Judgment is DENIED.

### 4. Punitive Damages

Isuzu has also moved for summary judgment as to punitive damages and has asserted that there is no factual or legal basis for punitive damages in this case. (Isuzu's Mem. 15.) The applicable Mississippi statute concerning punitive damages states, in part, the following:

> Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence, which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. § 11-1-65(1)(a). Isuzu argues that Plaintiffs have failed to produce any evidence that Isuzu acted maliciously or fraudulently. (Isuzu's Mem. 15.) Plaintiffs respond that Isuzu's knowledge of the Rodeo's likelihood of being involved in a rollover crash, of the importance of the roof structure of the Rodeo in a rollover crash, and of alternative designs, which were available to Isuzu's engineers at the time that the Rodeo was designed, along with Isuzu's failure to dynamically test the Rodeo, collectively exhibit wanton and reckless disregard and warrant the imposition of punitive damages. (Pls.' Opp'n to Def. Isuzu's Mot. for Summ. J. 13.)

In <u>Cmty. Bank, Ellisville, Mississippi v. Courtney</u>,
884 So.2d 767, 783 (Miss. 2004), the Mississippi Supreme
Court stated that "[t]he statute and case law specifically
give the trial court the authority to initially determine
whether the particular facts of a case merit the submission
of the issue of punitive damages to the jury."  The trial
court makes this determination by deciding "whether, under
the totality of the circumstances and viewing the
defendant's conduct in the aggregate, a reasonable,
hypothetical trier of fact could have found either malice
or gross neglect/reckless disregard."  <u>Id.</u>; <u>see also</u>
<u>Tideway Oil Programs, Inc. v. Serio</u>, 431 So.2d 454, 460 &
n. 1 (Miss. 1983)("[T]here must be some element of
aggression or some coloring of insult reflecting malice,
gross negligence, or ruthless disregard for the rights of
others.").  <u>Cooper Tire & Rubber Co. v. Tuckier</u>, 826 So.2d
679 (Miss. 2002), provides a helpful illustration of this
determination.  In that case, the Mississippi Supreme Court
affirmed the decision to allow the jury to consider
punitive damages in a case involving a detreaded tire
because the plaintiffs had provided witnesses who testified
that, during their employment with the tire company, they
had knowledge that the company had used bad stock in its
manufacturing of tires:  "The testimony provided by [the

plaintiffs'] witnesses and the verdict of the jury giving
weight to this testimony provided the necessary requirement
of knowledge that allowed this issue to be considered by
the jury." Id. at 690.

In this case, Plaintiffs have provided no such
evidence of Isuzu's knowledge of the alternative designs
available to Isuzu other than the unsupported assertion
that those alternative designs were widely known throughout
the automobile industry at the time of the Rodeo's design.
Plaintiffs have provided no evidence of Isuzu's knowledge;
therefore, they have provided no evidence of malice or
wanton disregard. Accordingly, the Court GRANTS Isuzu's
Motion for Summary Judgment as to punitive damages.[7]

---

[7] Having granted Isuzu's Motion for Summary Judgment as to the failure
to state a claim for punitive damages, the Court need not address the
Isuzu's argument that Miss. Code Ann. § 11-1-65 is unconstitutionally
vague.

**IV. Conclusion**

For the reasons discussed above, the Court DENIES Defendant Michelin's Motion to Exclude Opinions of Troy Cottles and for Summary Judgment and GRANTS Isuzu's Motion for Summary Judgment as to Plaintiff Green and as to punitive damages, but otherwise DENIES Defendant Isuzu's Motion to Exclude Testimony of Plaintiffs' Experts and for Summary Judgment.

SO ORDERED this 25th day of July, 2008.


/s/ JON P. McCALLA
UNITED STATES DISTRICT JUDGE